**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JAMES E. STILTNER,
Plaintiff-Appellant,

v.                                                        No. 94-1323

BERETTA U.S.A. CORPORATION,
Defendant-Appellee.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Chief District Judge.
(CA-92-3507-JFM)

Argued: September 27, 1995

Decided: February 2, 1996

Before ERVIN, Chief Judge, RUSSELL, WIDENER, HALL,
MURNAGHAN, WILKINSON, WILKINS, NIEMEYER,
HAMILTON, LUTTIG, WILLIAMS, and MICHAEL, Circuit
Judges, and PHILLIPS, Senior Circuit Judge, sitting en banc.

_____

Affirmed by published opinion. Judge Hamilton wrote the majority
opinion, in which Judges Russell, Widener, Wilkinson, Wilkins, Nie-
meyer and Williams joined. Judge Luttig wrote a separate opinion
concurring in the judgment. Senior Judge Phillips wrote an opinion
concurring in part and dissenting in part in which Chief Judge Ervin
and Judges Hall, Murnaghan and Michael joined. Judge Motz did not
participate in this case.

_____

**COUNSEL**

**ARGUED:** Christy Concannon, BAPTISTE & WILDER, P.C.,
Washington, D.C., for Appellant. Jerrold Alan Thrope, GORDON,

FEINBLATT, ROTHMAN, HOFFBERGER & HOLLANDER, Baltimore, Maryland, for Appellee. **ON BRIEF:** Roland P. Wilder, Jr., Susan Boyle, BAPTISTE & WILDER, P.C., Washington, D.C.; Marc H. Rifkind, SLEVIN & HART, P.C., Washington, D.C., for Appellant. Gregory S. Reynolds, GORDON, FEINBLATT, ROTHMAN, HOFFBERGER & HOLLANDER, Baltimore, Maryland, for Appellee.

_____

## OPINION

HAMILTON, Circuit Judge:

Appellant, James E. Stiltner (Stiltner), appeals an order granting summary judgment in favor of his former employer, Beretta U.S.A. Corp. (Beretta), on Stiltner's ERISA and state law claims against Beretta. A divided panel of this court affirmed the summary judgment as to Counts I, II, and IV of Stiltner's complaint, but vacated and remanded as to Count III of the complaint. See Stiltner v. Beretta U.S.A. Corp., No. 94-1323 (4th Cir. January 18, 1995) (designated for publication, but not reported). On Beretta's suggestion, we vacated the panel decision and reheard the case en banc . Having considered the briefs and the arguments of the parties, we now affirm in toto the district court's grant of summary judgment.

I.

On November 21, 1988, Stiltner began working as a tool room supervisor for Beretta, a Maryland arms manufacturer. Frank Valorose, a Beretta employee, helped Stiltner obtain the job. Valorose had been Stiltner's manager at Stiltner's former job with FN Manufacturing (FN).

Stiltner's initial employment status was that of an independent contractor. Although he was not entitled to the fringe benefits that regular employees received, Stiltner received free housing from Beretta, as well as an allowance to pay for his COBRA coverage under FN's health insurance plan.**1**

_____

**1** Under the Consolidated Omnibus Budget Reconciliation Act (COBRA), employers must offer terminated employees the option of

On February 28, 1989, Beretta offered Stiltner a job as a regular employee. The terms of the offer were described in a letter given to Stiltner by Peter Axelrod, Beretta's human resources manager. Stiltner and Axelrod reviewed the letter together, and Stiltner signed the letter to indicate that he found the terms of the offer acceptable. Among the benefits described in the letter were the following:

> Medical Insurance: Company paid hospitalization and medical insurance for you and your dependents . . . .

> Long Term Disability: Pays 60% of salary after six months of disability (after one year of employment). Payable to age 70.

(J.A. 83). Axelrod agreed to make Stiltner's regular employment date retroactive to November 21, 1988, for purposes of his eligibility for vacation and benefits.

Stiltner enrolled in two welfare benefit plans that Beretta provided for its employees. The first of these plans, Beretta U.S.A. Health Plan # 501 (the Health Plan) provided group health insurance for all full-time employees and their eligible dependents. The Health Plan provided that coverage would cease at the end of the month in which an employee stopped active work on a full-time basis.

The second plan, Beretta U.S.A. Life and Disability Plan # 502 (the Disability Plan), provided long-term disability benefits to full-time employees who became disabled after one year of employment. At the time Stiltner enrolled, American Bankers Life Assurance Company (American Bankers) provided the coverage under this plan. American Bankers issued a disability plan insurance policy that expressly excluded coverage for disabilities caused by pre-existing conditions. Although the certificate of insurance/benefits booklet that American Bankers issued to participants in the disability plan clearly disclosed this pre-existing condition limitation, the summary plan description then in effect for the disability plan (the original SPD) did

_____

continuing coverage under the employer's group health plan. 29 U.S.C. §§ 1161, 1163(2).

3

not. Stiltner claims that he did not receive a copy of the certificate of insurance/benefits booklet until after he became disabled.

In February 1990, Beretta changed the insurer of its disability plan to the Guardian Life Assurance Company of America (Guardian). The Guardian policy, like the American Bankers policy, had an express pre-existing condition limitation. The new certificate of insurance/benefits booklet issued by Guardian clearly disclosed the pre-existing condition limitation. Beretta sent copies of the new booklet to participating employees, along with a memo entitled "Summary Plan Description Supplement to Certificate for the Beretta U.S.A. Health and Welfare Plans" (the SPD Supplement). The SPD Supplement stated that "[t]his supplement and your certificates of insurance/benefits booklets constitute the Summary Plan Description as required by [ERISA]." (J.A. 566). Stiltner claims that he did not receive a copy of either the new certificate of insurance/benefits booklet or the SPD Supplement until after he became disabled.

Stiltner suffered from a heart condition when he began working for Beretta. On February 6, 1990, he had a heart attack. After the heart attack, he worked sporadically until June 9, 1990. Since that date, he has not worked for Beretta or anyone else because of his heart problems.

To assist Stiltner in filing a disability insurance claim, Beretta sent Stiltner the new Guardian certificate of insurance/benefits booklet, the original SPD for the Disability Plan, and the SPD Supplement for that plan. Stiltner applied to Guardian for long-term disability benefits under the Disability Plan, and to the Social Security Administration for Social Security disability benefits. Guardian denied Stiltner's claim because his disability arose out of a pre-existing condition.

Beretta attempted to help Stiltner in several ways. First, Beretta wrote Guardian, urging it to reconsider its decision to deny Stiltner's claim for disability benefits. Second, although it was clear that Stiltner would never be able to return to work after June 9, 1990, Beretta kept paying Stiltner his full salary until October 1990, when Stiltner began receiving Social Security disability benefits. Third, despite a provision in the Health Plan stating that coverage would end when he ceased active work on a full-time basis, Beretta kept paying Stiltner's

4

health insurance premiums while Guardian was considering his claim for disability benefits.

In June 1992, Guardian informed Stiltner that its decision to deny his claim for long-term disability benefits was final. Subsequently, Stiltner demanded that Beretta pay him more than $330,000 in long-term disability benefits. He claimed that he was entitled to the benefits under the terms of his employment contract and the Disability Plan, regardless of the exclusions in the insurance policies. Beretta, which was still gratuitously paying Stiltner's health insurance premiums, refused Stiltner's demand. Stiltner then informed Beretta that he intended to assert an ERISA claim for long-term disability benefits and offered to settle that claim for approximately $332,000. Although Beretta did not believe it was legally obligated to pay Stiltner the disability benefits, it offered to pay him $3,000 and to continue paying his health insurance premiums for an additional 18 months, if he would agree to release it from all liability arising from his claim for disability benefits. Beretta added that if Stiltner refused to accept this settlement, it would cease paying any further health insurance premiums on Stiltner's behalf.[2]

Stiltner filed this action against Beretta, raising four claims. In Count I of his complaint, Stiltner alleged that he was entitled to recover long-term disability benefits from Beretta under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), because the original SPD for the Disability Plan did not mention the pre-existing condition exclusion. In Count II, he alleged that he was entitled to the disability benefits under the terms of the February 28, 1989 offer letter, which Stiltner described as an employment contract. In Count III, Stiltner alleged that Beretta violated ERISA § 510, 29 U.S.C.§ 1140, by stating that it would stop paying for his health insurance coverage if he exercised his rights under ERISA to sue Beretta for disability benefits. Finally, in Count IV, he alleged that Beretta's refusal to pay him the disability benefits and its threat to cut off his health insurance benefits if he did not drop his claim for those disability benefits constituted intentional infliction of emotional distress under Maryland law.

_____

[2] Beretta did not withdraw the gratuitously furnished health care benefits until March 1993.

Stiltner also sought a temporary restraining order and preliminary injunction to prevent Beretta from terminating his health insurance benefits, expelling him from the Health Plan, severing his employment relationship, or otherwise retaliating against him for exercising his rights under the Disability Plan and ERISA, pending final determination of the merits of his case. The district court denied the motion for preliminary relief.

Stiltner appealed the district court's denial of his request for preliminary relief. While his appeal was pending before this court, the district court granted summary judgment in favor of Beretta on all of Stiltner's claims. We, therefore, sua sponte, dismissed Stiltner's appeal involving the denial of his request for a preliminary injunction. Stiltner v. Beretta U.S.A. Corp., No. 93-1247 (4th Cir. March 28, 1994). Stiltner now appeals the district court's grant of summary judgment in favor of Beretta.[3]

II.

In Count I of his complaint, Stiltner alleged that he was entitled to recover long-term disability benefits from Beretta under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3),[4] even though his disability was caused by a pre-existing condition within the meaning of the exclusion in the Guardian policy, because the pre-existing condition limitation was not mentioned in the original SPD for the Disability Plan. Stiltner bases this claim upon our decisions in Aiken v. Policy Management Sys. Corp., 13 F.3d 138, 140-41 (4th Cir. 1993), and Pierce v. Security Trust Life Ins. Co., 979 F.2d 23, 27 (4th Cir. 1992), which he says hold that representations made in a summary plan description

_____

[3] The panel, like the en banc court, was unanimous in rejecting Stiltner's claims that Beretta violated ERISA § 502, the terms of his employment contract, and Maryland law. Judge Phillips wrote the panel decision, which was designated for publication, but not reported. See Stiltner v. Beretta U.S.A. Corp., No. 94-1323 (4th Cir. January 18, 1995). We have incorporated verbatim Judge Phillips' well-reasoned analysis of these claims in parts II, III, and IV of this opinion.

[4] ERISA § 502(a)(3) permits a participant in an ERISA plan to bring an action for "appropriate equitable relief . . . to enforce . . . the terms of the plan." 29 U.S.C. § 1132(a)(3).

6

control over conflicting statements made in other official plan documents. The district court held that Beretta was entitled to summary judgment on this claim, because Stiltner had failed to come forward with sufficient evidence to permit a reasonable fact finder to find that he had either relied upon or been prejudiced by the original SPD's failure to mention the pre-existing condition exclusion.

We find no fault in the district court's disposition of this claim. It is certainly true that the original SPD was inconsistent with the other official plan documents, in that it failed to reveal the existence of the pre-existing condition limitation. But, as the district court recognized and Stiltner now concedes, to secure relief under ERISA based on representations in a summary plan description that are inconsistent with provisions of the other official plan documents, an ERISA claimant must demonstrate that he either relied upon or was prejudiced by those representations. Aiken, 13 F.3d at 141; Pierce, 979 F.2d at 27. As the district court pointed out, the summary judgment record contained undisputed evidence that Stiltner did not see a copy of the original SPD until after he suffered the disability for which he now seeks to recover benefits. (J.A. 286-87).**5** On this record, we agree with the

_____

**5** In an attempt to overcome this problem, Stiltner contends that he did come forward with evidence that members of Beretta's management team gave him "verbal and written descriptions of the information contained in [the original SPD]" when he first enrolled in the Disability Plan, that those descriptions did not mention a pre-existing condition limitation, and that he relied upon them to his detriment in failing to make other arrangements for long-term disability insurance. Specifically, he points to (i) deposition testimony that Valorose told him, over lunch on the day of his initial interview at Beretta, that the benefit package he would receive at Beretta would be "similar to" the one he had received from his former employer, FN; (J.A. 183, 189-90) (Valorose deposition); (J.A. 226) (Stiltner deposition); and (ii) evidence that Axelrod told him, both in the February 28, 1989 offer letter and in his oral discussions of the terms of that letter, that he would receive long-term disability benefits after one year of employment, without indicating that there was a pre-existing condition limitation on those benefits.

As did the district court, we find this evidence to be singularly lacking in probative value. In the first place, we do not think that Stiltner could reasonably have interpreted any of the alleged representations by

7

district court that Stiltner failed to carry his burden of coming forward with sufficient evidence to permit a reasonable fact finder to find that he had relied upon or been prejudiced by the inaccuracy in the original SPD, which is an essential element of his claim for relief under Aiken and Pierce.**6** We therefore conclude that the district court did not err in entering summary judgment for Beretta on Stiltner's claim for disability benefits under ERISA § 502.

III.

In Count II of his complaint, Stiltner alleged that Beretta had breached the terms of its February 28, 1989 offer letter, which he characterized as a contract of employment, by refusing to pay him the disability benefits he sought. Stiltner alleged that because the letter stated that Beretta would provide Stiltner with long-term disability insurance that "pays 60% of salary after six months of disability (after one year of employment)," without mentioning a pre-existing condition limitation, it imposed upon Beretta a legally enforceable obligation to pay him long-term disability benefits if he became disabled

_____

Valorose or Axelrod as descriptions of the content of the original SPD, since none of them made any reference to that document. In addition, we do not think an ERISA claimant can be said to have "relied" upon an SPD that he has never seen, in the sense required by Aiken and Pierce, simply because he has relied upon informal oral and written summaries of its contents made to him by the employer's agents. Cf. Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 60 (4th Cir. 1992) (plan partici- pant not entitled to recover benefits to which she was not entitled under plain language of plan itself, simply because she claimed that plan administrator had made informal oral and written representations to her indicating that she would receive such benefits, where the alleged modi- fications to the plan were not implemented in conformity with the plan's formal amendment procedure), cert. denied, ___ U.S. ___, 113 S. Ct. 1051 (1993); Singer v. Black & Decker Corp., 964 F.2d 1449, 1453-54 (4th Cir. 1992) (Wilkinson, J., concurring).

**6** In light of this conclusion, we need not address Beretta's alternative argument that Stiltner cannot maintain an Aiken/Pierce claim based on the original SPD because it was superseded by the SPD Supplement before he became disabled.

8

after one year of employment, whether or not the disability in question was caused by a pre-existing condition.

The district court held that Beretta was entitled to summary judgment on this claim. The court thought that the claim was probably preempted by ERISA, under Biggers v. Wittek Indus., Inc., 4 F.3d 291, 298 (4th Cir. 1993), because it "related to" the Beretta Disability Plan. But the court found it unnecessary to decide whether the claim was actually preempted or not. As the court explained, if the claim were preempted, it would fail as a matter of law because it could not be recast as a viable federal claim. The offer letter could not be enforced as an informal ERISA plan, because it did not meet the four requirements for a plan set forth in Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir. 1982) (en banc). Similarly, it could not be enforced under a federal common-law breach of contract theory, because no reasonable fact finder could find that the parties intended it to impose upon Beretta an obligation to pay Stiltner long-term disability benefits above and beyond those provided by the terms of the Disability Plan. (J.A. 14-15). Finally, even if the claim were not preempted, it would still fail as a matter of law under basic principles of Maryland contract law, for the same reason that it would fail under federal common-law contract principles: because no reasonable fact finder could find, on the record before it, that the parties had intended the offer letter to impose upon Beretta a corporate obligation to pay Stiltner long-term disability benefits beyond those provided by the Disability Plan that Beretta maintained through its insurer.

Once again, we find no fault with the district court's disposition of this claim. As did the district court, we think it very likely that the claim is preempted by ERISA § 514(a), because it seeks to recover benefits of a sort which are already provided by an ERISA plan, even though it seeks to recover them not from the plan itself, but from the employer directly. See Biggers, 4 F.3d at 298; Cefalu v. B.F. Goodrich Co., 871 F.2d 1290, 1295 (5th Cir. 1989). We also agree with the district court that if the state-law breach of contract claim is preempted, it cannot be salvaged by recasting it as a statutory ERISA claim or a federal common-law claim, because it would fail as a matter of law under either theory. The representations about disability benefits made in the offer letter cannot be enforced as an independent ERISA plan, because the letter does not constitute a "plan" under the

9

test set forth in Donovan v. Dillingham, 688 F.2d 1367, 1372 (9th Cir. 1982) (en banc), which this Court adopted in Elmore v. Cone Mills, 23 F.3d 855, 861 (4th Cir. 1994) (en banc). [7] Nor do the representations about disability benefits made in the offer letter give rise to a viable claim for benefits under the federal common law of contract; as the district court explained at some length, no reasonable fact finder could possibly find that the parties intended them to impose upon Beretta an obligation to pay Stiltner long-term disability benefits above and beyond those provided by the terms of the Disability Plan itself. Finally, even if the claim is not preempted, it would still fail as a matter of law under Maryland law, for the same reason that it would fail under federal common-law principles: because no reasonable fact finder could find that the parties intended the representations made about disability benefits in the offer letter to impose upon Beretta a corporate obligation to pay Stiltner long-term disability benefits beyond those provided by the Disability Plan that Beretta maintained through its insurer.

The district court did not err in entering summary judgment for Beretta on Stiltner's contract claim.

IV.

In Count IV of his complaint, Stiltner alleged that Beretta's conduct in refusing to pay him disability benefits and threatening to cut off his health insurance benefits if he did not drop his claim for disability benefits constituted intentional infliction of emotional distress under Maryland law. The district court held that Beretta was entitled to summary judgment on this claim on two independent, alternative grounds: because it was preempted by ERISA, and because the conduct complained of was not sufficiently "outrageous" to support a claim for intentional infliction of emotional distress under Maryland law. (J.A. 16-17). We agree.

_____

[7] The offer letter does not meet at least two of the four requirements for an informal plan under Donovan: it does not show the source of the funding for the benefits described, and it does not indicate the procedure by which an employee can apply for and receive benefits. See Cone Mills, 23 F.3d at 861; Donovan, 688 F.2d at 1373.

ERISA preempts state-law claims to the extent they "relate to" any ERISA plan. 29 U.S.C. § 1144(a). A state-law claim "relates to" an ERISA plan, hence is preempted, "if it has a connection with or reference to such a plan," Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 97 (1983), so that state common-law tort and contract actions which are "based on alleged improper processing of a claim for benefits under an employee benefit plan" are preempted by ERISA. Pilot Life Ins. v. Dedeaux, 481 U.S. 41, 48 (1987). Applying this analysis, the lower federal courts uniformly have held that state-law claims of intentional infliction of emotional distress which are based on the allegedly wrongful denial or termination of benefits under an ERISA plan are preempted by ERISA. See, e.g., Lopez v. Commonwealth Oil Refining Co., 833 F. Supp. 86, 89-90 (D. P.R. 1993) (retired employee's state-law emotional distress claim based on allegedly wrongful offsetting of disability benefits by amount of social security income was preempted by ERISA, because it was "directly related to the dispute concerning the [retired employee's rights under] the employee welfare benefit plan"); Lennon v. Walsh, 798 F. Supp. 845, 849 (D. Mass. 1992) (plan participant's state-law emotional distress claim based on allegedly wrongful denial of claims for medical and disability benefits under ERISA plan was preempted by ERISA); Thomas v. Telemecanique, Inc., 768 F. Supp. 503, 506 (D. Md. 1991) (discharged employee's state-law emotional distress claim based on allegedly wrongful accusations that she had been defrauding her employer by collecting disability benefits from its ERISA plan to which she was not entitled was preempted by ERISA, because "[t]he issue of whether the alleged conduct was extreme depends upon the parties' rights under the benefit plan"); Parisi v. Trustees of Hampshire College, 711 F. Supp. 57, 60-62 (D. Mass. 1989) (discharged employee's state-law emotional distress claim based on allegedly wrongful denial of claim for disability benefits was preempted by ERISA).

Stiltner attempts to distinguish these cases by arguing that his emotional distress claim is not based on allegations that Beretta wrongfully denied or terminated benefits to which he was entitled under its ERISA plans, but on allegations that it wrongfully denied or terminated benefits to which he was entitled under his employment contract. This argument is without merit. Count IV of Stiltner's complaint asserts a state-law emotional distress claim based on Beretta's conduct in "refusing to pay [him] agreed-upon disability benefits and [in]

11

threatening him with discontinuance of his family health insurance benefits to coerce him into abandoning his disability claim." Complaint ¶ 39. Count IV expressly incorporates by reference paragraphs 1 through 37 of the complaint, id. ¶ 38, which in turn assert that Beretta is obligated to pay Stiltner disability benefits under the terms of both its Disability Plan and his employment contract. Id. ¶¶ 27, 31. For this reason, Stiltner's claim that Beretta acted wrongfully in refusing to pay him the "agreed-upon disability benefits" cannot be resolved without reference to the Disability Plan. This in turn means that the claim "relates to" an ERISA plan within the meaning of ERISA's preemption clause, and is therefore preempted. See Thomas, 768 F. Supp. at 506; Lennon, 798 F. Supp. at 849; Parisi, 711 F. Supp. at 61-62.

Even if Count IV were not preempted, Beretta would still be entitled to summary judgment on it, for the conduct in question is not sufficiently "outrageous," as a matter of law, to support a claim for intentional infliction of emotional distress under Maryland law. In Maryland, the tort of intentional infliction of emotional distress requires proof of "extreme and outrageous" conduct by the defendant, and conduct will be found to rise to that level only if it "go[es] beyond all possible bounds of decency, and [is] to be regarded as atrocious, and utterly intolerable in a civilized community." Harris v. Jones, 380 A.2d 611, 614 (Md. 1977). Applying this test, the Maryland Court of Appeals has held that conduct very similar to that alleged here -- the intentional refusal to pay medical and disability benefits to which the plaintiff claimed entitlement under an insurance plan -- was not sufficiently "outrageous" to give rise to a claim for intentional infliction of emotional distress. Gallagher v. Bituminous Fire & Marine Ins. Co., 492 A.2d 1280, 1284-85 (Md. 1985). As the court there noted, while it is "conceivable" that the tort of intentional infliction of emotional distress "might be committed by means of withholding benefits," it will be "the rare case" indeed in which this is so. Id. We agree with the district court that this is not such a case. See Dickson v. Selected Risks Ins. Co., 666 F. Supp. 80, 81 (D. Md. 1987) (insurer's refusal to provide coverage under a liability insurance policy "does not approach the level of outrageousness necessary to sustain an intentional infliction of emotional distress claim" under Maryland law); Barksdale v. St. Clair County Comm'n, 540 So. 2d 1389, 1391 (Ala. 1989) (employer's termination of health benefits

12

that it had been gratuitously providing to a disabled employee was not sufficiently "outrageous" to give rise to a tort claim for intentional infliction of emotional distress under Alabama law).

The district court did not err in entering summary judgment for Beretta on Stiltner's state tort claim for intentional infliction of emotional distress.

V.

In Count III of his complaint, Stiltner alleged that Beretta violated ERISA § 510, 29 U.S.C. § 1140, by stating that it would stop paying his health insurance premiums if Stiltner sued Beretta for disability benefits. To validate Stiltner's claim, we would have to interpret ERISA § 510 to preclude an employer from revoking <u>any</u> benefit if the employer intended to retaliate against an employee for the employee's exercise of ERISA rights, regardless of whether the employer had provided that benefit gratuitously. This we refuse to do. We hold instead that ERISA § 510 does not preclude an employer from revoking gratuitous benefits.

A.

ERISA § 510 reads in pertinent part:

> <u>Interference with protected rights.</u> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or <u>discriminate against</u> a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter [ERISA Title I], section 1201 of this title, or the Welfare and Pension Plans Disclosure Act, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

29 U.S.C. § 1140 (emphasis added). This section prohibits two types of discrimination by an employer. First, an employer may not discriminate against an employee with the purpose of interfering with an

13

employee's <u>exercise</u> of certain rights. Second, an employer may not discriminate against an employee with the purpose of interfering with an employee's <u>attainment</u> of certain rights. In this case, we are concerned with the first type of discrimination. Stiltner claims that Beretta discriminated against him with the purpose of interfering with his exercise of his right under ERISA to sue Beretta for his disability benefits. The particular act of discrimination alleged by Stiltner is Beretta's refusal to continue gratuitously paying his health insurance premiums.**8**

To determine whether Stiltner's allegations create a cognizable claim, we must decide whether, under ERISA § 510, an employer can "discriminate against" an employee by revoking a gratuitous benefit. Stiltner argues that the phrase "discriminate against" refers to any adverse action, including the revocation of a gratuitous benefit. After applying the settled rules of statutory construction to ERISA § 510, we disagree.

In any case turning on statutory interpretation, our goal is to ascertain the intent of Congress. <u>See Dole v. United Steelworkers</u>, 494 U.S. 26, 35 (1990). To accomplish this goal, we begin by looking at the language of the statute. <u>Adams v. Dole</u>, 927 F.2d 771, 774 (4th Cir.), <u>cert. denied</u>, 502 U.S. 837 (1991). If the language is plain and unambiguous, we look no further. <u>See United States v. Ron Pair Enters., Inc.</u>, 489 U.S. 235, 240-41 (1989). However, if the statutory phrase at issue is ambiguous, we may look beyond the language of the statute to the legislative history for guidance. <u>United States v. Irvin</u>, 2 F.3d 72, 76 (4th Cir. 1993), <u>cert. denied</u>, 114 S. Ct. 1086 (1994); <u>Adams</u>, 927 F.2d at 774. If Congress' intent is not readily apparent from examining the legislative history, we apply the traditional tools of statutory construction. <u>Adams</u>, 927 F.2d at 774; <u>see also Stupy v. United States Postal Serv.</u>, 951 F.2d 1079, 1081 (9th Cir. 1991) ("The search for legislative intent begins with an examination of the language of the statute and then proceeds to a review of the legislative history and the application of traditional aids of statutory interpretation.").

_____

**8** Beretta continued gratuitously furnishing health care benefits until March 1993, even though Stiltner did not work after June 1990, and Beretta continued Stiltner on salary until October 1990.

14

From the outset, we note the phrase "discriminate against" in ERISA § 510 is ambiguous. This view is in accord with other circuit courts that have examined the phrase. See, e.g. , West v. Butler, 621 F.2d 240, 245 (6th Cir. 1980) (relying on ERISA§ 510's legislative history to determine whether certain conduct constitutes discrimination); see also Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 236 (4th Cir. 1991) (examining the legislative history of ERISA § 510 and stating that to determine whether a claim is cognizable under that section, "we look first to the statute itself and the intent of Congress"). Accordingly, like other courts examining the phrase "discriminate against," we must turn to the legislative history.

Turning to the legislative history of ERISA § 510, we find that it is silent regarding whether Congress intended the revocation of gratuitous benefits to constitute discrimination. See  S. Rep. No. 127, 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 4838, 4872 (noting that ERISA § 510 was enacted "in the face of evidence that in some plans a worker's pension rights or the expectations of those rights were interfered with by the use of economic sanctions or violent reprisals").

Thus, from the legislative history, it is not at all apparent that Congress intended the revocation of gratuitous benefits to constitute discrimination for purposes of ERISA § 510. Moreover, the silence on this issue is some evidence that Congress did not intend such a result. See Dewsnup v. Timm, 112 S. Ct. 773, 779 (1992) (holding that in construing ambiguous language in the Bankruptcy Code, it is not plausible to assume that Congress intended to create a broad new remedy when such a new remedy is not mentioned in the Code or in the annals of Congress).

The legislative history of ERISA § 510 does make clear, however, that the statute was modeled on § 8(a)(3) of the National Labor Relations Act (NLRA). See West, 621 F.2d at 245 & n.4; Young v. Standard Oil, 660 F. Supp. 587, 597 (S.D. Ind. 1987), aff'd, 849 F.2d 1039 (7th Cir.), cert. denied, 488 U.S. 981 (1988); see also 119 Cong. Rec. 30374, reprinted in Subcomm. on Labor, Senate Comm. on Labor and Public Welfare, Legislative History of the Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406 (Comm. Print 1976), at 1774-75 (statement of Sen. Hartke) ("The language [of

15

ERISA § 510] parallels section 8(a)(3) of the National Labor Relations Act . . . .").[9]

Because ERISA § 510 was modeled on NLRA § 8(a)(3), we may look to NLRA § 8(a)(3), and the cases construing it, for guidance in construing ERISA § 510. Under NLRA § 8(a)(3), "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization" constitutes an unfair labor practice. 29 U.S.C. § 158(a)(3). This language is similar to the language in ERISA § 510 forbidding employers from "discriminat[ing] against" employees for exercising any ERISA right. The "[i]ncorporation of identical or similar language from an act with a related purpose evidences some intention to use it in a similar vein." See Doe v. DiGenova, 779 F.2d 74, 83 (D.C. Cir. 1985) (emphasis added); see also Stribling v. United States, 419 F.2d 1350, 1352-53 (8th Cir. 1969) (express language and legislative construction of another statute employing similar language and applying to similar persons may control by analogy); 2B George Sutherland, Statutes and Statutory Construction § 53.03, at 233 (5th ed. 1992) ("[B]y transposing the clear intent expressed in one or several statutes to a similar statute of doubtful meaning, the court . . . is able to give effect to the probable intent of the legislature . . . .").

Under NLRA § 8(a)(3), an employer's revocation of a gratuitous benefit does not constitute unlawful discrimination. See, e.g., NLRB v. Electro Vector, 539 F.2d 35, 37 (9th Cir. 1976) ("[A] bonus which is considered a `gift' can be withheld by the employer at will . . . ."), cert. denied, 434 U.S. 821 (1977); NLRB v. Wonder State Mfg. Co., 344 F.2d 210, 212 (8th Cir. 1965) ("The rule is that gifts per se . . . are not terms and conditions of employment, and an employer can make or decline to make such payments as he pleases . . . ."). Because NLRA § 8(a)(3) does not prohibit the revocation of gratuitously provided benefits and Congress modeled ERISA § 510 after the NLRA, we are reluctant to conclude that Congress intended ERISA § 510 to prohibit the revocation of gratuitous benefits.

_____

[9] Even Stiltner acknowledges that Congress modeled ERISA § 510 after NLRA § 8(a)(3).

16

Additionally, in cases involving interference with the attainment of ERISA rights, numerous courts have limited "discriminate against," as used in ERISA § 510, to actions affecting the employer-employee relationship. See, e.g., Haberern v. Kaupp Vascular Surgeons Ltd. Defined Benefit Pension Plan, 24 F.3d 1491, 1503 (3rd Cir. 1994), cert. denied, 115 S. Ct. 1099 (1995); see also McGath v. Auto-Body North Shore, Inc., 7 F.3d 665, 667-69 (7th Cir. 1993) (interpreting ERISA § 510 to encompass only discrimination in the employment relationship); Woolsey v. Marion Labs., Inc., 934 F.2d 1452, 1461 (10th Cir. 1991) (employer's acts must affect the employment situation to create a cognizable claim under ERISA § 510). With this interpretation of the phrase "discriminate against" so firmly entrenched, we are not inclined to ascribe a second meaning to the phrase in cases involving interference with the exercise of ERISA rights. In sum, we hold that ERISA § 510 does not prohibit the revocation of gratuitously provided benefits.

B.

Our holding that ERISA § 510 does not preclude an employer from revoking gratuitous benefits supports the public policy of encouraging employers to offer employees gratuitous benefits. Under Stiltner's interpretation of ERISA § 510, employers who seek to help their employees by providing gratuitous benefits risk a lawsuit if they revoke the benefits. Faced with the possibility that they could be forced to continue paying benefits originally provided gratuitously, employers may be inclined to turn a cold shoulder to the special needs of particular employees. See Hamilton v. Air Jamaica, Ltd., 945 F.2d 74, 79 (3d Cir. 1991) ("Employers are understandably more willing to provide employee benefits when they can reserve the right to decrease or eliminate those benefits."), cert. denied, 503 U.S. 938 (1992).

Although Congress has determined, by enacting ERISA§ 510, that once an employer elects to include certain benefits within its employment package, it cannot revoke them with the intent to deter employees from asserting their rights under ERISA, this policy has no application when the benefits at issue are merely gratuitous. See Owens v. Storehouse, Inc., 984 F.2d 394, 398 (11th Cir. 1993) ("Absent contractual obligation, employers may decrease or increase

17

benefits."); <u>Leavitt v. Northwestern Bell Tel. Co.</u>, 921 F.2d 160, 162 (8th Cir. 1990) ("ERISA is concerned with protecting <u>contractual</u> benefits.") (emphasis added). The contrary interpretation urged by Stiltner would only work to the detriment of employees.

C.

Although ERISA § 510 does not apply to the revocation of gratuitously provided benefits, employers cannot escape liability under ERISA § 510 for revoking all benefits conferred on employees. In some cases, a benefit that was originally provided gratuitously may develop into a nongratuitous benefit. Section 510 does apply to the revocation of a nongratuitous benefit.

A benefit may become nongratuitous, and thus be protected under ERISA § 510, when it is provided regularly and consistently, when the employer has a formal policy that determines eligibility for the benefit, or when the employer refers to the benefit as an inducement to future employees. <u>Cf. New River Indus., Inc. v. NLRB</u>, 945 F.2d 1290, 1294 (4th Cir. 1991) (holding, in the labor relations context, that a one-time gift is not a condition of employment); <u>NLRB v. Citizens Hotel Co.</u>, 326 F.2d 501, 503 (5th Cir. 1964) (discussing, in the labor relations context, factors that may determine whether a benefit is a term or condition of employment). On the other hand, a benefit is merely gratuitous when there is a lack of consistency or regularity in providing the benefit and when there is no official program under which the benefits are provided, <u>i.e.</u>, the benefits are provided entirely at the employer's discretion.

D.

Stiltner concedes that Beretta's payment of his health insurance premiums after he ceased working amounted to a gratuitous benefit. Because the benefit was gratuitous, Beretta could revoke it freely without violating ERISA § 510.**10**

_____

**10** Beretta gratuitously paid Stiltner's health insurance premiums for almost three years, without any indication that it intended to terminate those benefits. In 1992, Beretta re-enrolled Stiltner in its employee health

18

E.

In summary, we can find no support for Stiltner's interpretation of the ambiguous phrase "discriminate against" in the language of ERISA § 510, in the legislative history of ERISA § 510, or in public policy. His interpretation would require us to hold that an employer that paid an employee's health insurance premiums when it unquestionably had no duty to do so discriminated against the employee by refusing to continue this gratuity after the employee threatened to sue for additional benefits. To conclude, as Stiltner does, that Congress could have intended to punish this employer is nothing short of startling. Without any indication from Congress that it intended this startling result, we decline to ascribe such an intent to Congress.

VI.

For the reasons stated in this opinion, the judgment of the district court is affirmed.

<u>AFFIRMED</u>

LUTTIG, Circuit Judge, concurring in the judgment:

I believe that section 510 of ERISA, 29 U.S.C. § 1140, protects employees only against discriminatory actions that substantially affect the employment relationship, as virtually every court of appeals to consider the scope of this provision has concluded, <u>see</u>, <u>e.g.</u>, <u>Haberern</u> v. <u>Kaupp Vascular Surgeons Plan</u>, 24 F.3d 1491, 1502-06 (3d Cir. 1994); <u>Deeming</u> v. <u>American Standard Inc.</u>, 905 F.2d 1124, 1126-28 (7th Cir. 1990); <u>West</u> v. <u>Butler</u>, 621 F.2d 240, 245-46 (6th

_____

care plan. Coverage under the plan was to remain in effect until August 1, 1993. Beretta also sent Stiltner a letter indicating that he was re-enrolled in the health care plan as an inactive employee on leave of absence. Normally, these facts would create a genuine issue of material fact as to whether the payment of health insurance premiums had developed into a nongratuitous benefit. In the present case, however, Stiltner <u>conceded</u> that Beretta had no obligation to continue paying his health insurance premiums. Thus, these facts do not affect the analysis.

19

Cir. 1980), and that the cessation of wholly gratuitous benefits is not action that properly may be understood as affecting the employer-employee relationship. This belief, together with the fact that section 510 is modeled after section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3), which itself does not prohibit discrimination in gratuities, are sufficient in my mind to justify the majority's holding that section 510 should not be extended to protect against discrimination with respect to benefits that are wholly gratuitous. For these reasons, I concur in the court's judgment.

I ascribe no particular significance to the fact that section 8(a)(3) of the National Labor Relations Act includes, but section 510 of ERISA omits, the language "term or condition of employment." It is evident that section 510 was "modeled" after section 8(a)(3) not in the sense that the actual language was imported into section 510, but rather, only in the sense that Congress wished to achieve in section 510 that which it had achieved in section 8(a)(3), namely, the protection of employees against employer retaliation for the exercise of protected rights. Indeed, virtually none of the language used in section 8(a)(3) is actually used in section 510. Thus, this is not the typical circumstance where Congress actually repeated the identical language from an extant statute in order that the subsequently-enacted statute would be identically interpreted, in which event the omission of particular language in the later statute might well be suggestive of a different intent. Here, any negative implication from the absence of any particular language in one of these provisions, and the inclusion of that language in the other, is simply unwarranted.

PHILLIPS, Senior Circuit Judge, concurring in part and dissenting in part:

I dissent from that part of the judgment which affirms dismissal of Stiltner's claim of discriminatory retaliation under ERISA § 510, and from Part V of the majority opinion which deals with that claim. Otherwise, I concur.

I would hold, contrary to the majority, that Stiltner's § 510 retaliation claim should not have been dismissed by summary judgment.

20

I

The dispute giving rise to this claim had its origins in times of apparently exemplary employment relations between Stiltner and Beretta. Stiltner, obviously a good and respected employee, had fallen on hard times with a first heart attack that forced him into intermittent work, then another attack four months later that put him in the hospital and out of work for good. While he was hospitalized, Beretta actively sought to help him through the economic difficulties brought on by his illness. The company first helped him process a claim for long-term disability benefits with the insurer of its disability-benefit plan. When the insurer initially denied the claim, Beretta urged the insurer to reconsider. During this time, Beretta continued to pay Stiltner his full salary for several months until he began to receive social security disability benefits. And, finally, although Beretta's separate group health insurance plan provided that its coverage normally would end when an employee stopped active work on a full time basis, Beretta kept Stiltner's coverage in force by paying the premiums while his claim for disability benefits was pending. Beretta was still paying them when, two years after Stiltner stopped work, the insurer finally denied his disability benefits claim on the basis of a preexisting condition exclusion.

At this point, the good relations between Stiltner and Beretta began to sour. Taking the position that Beretta was liable to him under his employment contract and Beretta's ERISA-covered disability plan for the disability benefits its plan insurer had refused to pay, Stiltner, through counsel, made a formal written demand upon Beretta for over $330,000. When Beretta refused to pay, Stiltner notified Beretta that he intended to assert an ERISA legal claim for the disability benefits, and offered to settle that claim for around $332,000. Beretta responded by letter in which it denied any legal obligation to pay the disability benefits, but offered to settle Stiltner's claim by paying him a lump sum of $3,000 and continuing to pay his health insurance premiums for another eighteen months, in return for Stiltner's release of Beretta from all claims of liability for the disability benefits. Critically, Beretta's letter threatened that if Stiltner did not accept its counteroffer by a certain date, Beretta would "terminate all payments, whether for health insurance or for any other cause, on [Stiltner's] behalf."

After Stiltner had refused this offer and brought this action, Beretta followed through on its threat and ceased paying premiums on Stiltner's group health insurance plan.

Stiltner's action included the § 510 retaliation claim here in issue. This claim, based on the provision in § 510 which makes it unlawful for an employer "to . . . discriminate against a participant or beneficiary [in an ERISA plan] for exercising any right to which he is entitled under [ERISA or an ERISA plan]," alleged such discrimination in Beretta's ceasing to pay the premiums on Stiltner's health insurance policy in promised reprisal for his threatening, then bringing, legal action to recover the disability benefits. Both the district court and the en banc majority rightly have recognized that this provision of § 510 is effectively an "anti-retaliation" provision of the type found, inter alia, in § 8(a)(3) of the National Labor Relations Act (NLRA).**1** But, both courts then concluded that Stiltner's retaliation claim failed as a matter of law on the summary judgment record: the district court, primarily because it thought § 510 retaliatory-discrimination must involve disparate treatment--not present here--of comparably situated persons, J.A. 7, 126-29; the en banc majority, because it thinks the termination of "gratuitously"-extended benefits cannot under any circumstances constitute retaliatory-discrimination under ERISA § 510, ante at 13 ("ERISA § 510 does not preclude an employer from revoking gratuitous benefits"); 17 (anti-retaliation "policy has no application when the benefits at issue are merely gratuitous"). By these different holdings, the district court may have accepted that gratuitous benefits might be the subject of the § 510 retaliatory-discrimination, but only if disparate treatment were involved, while the en banc majority apparently accepts that § 510 retaliatory-discrimination may involve singular (not disparate) forms of adverse treatment, but that the revocation of "gratuitous" benefits is not such a form. I think both are wrong in their interpretation of the intended reach of this anti-retaliation provision. Because I would reverse the district court's holding, but on grounds that also reject the en banc majority's interpretation, I address each in turn.

_____

**1** In so doing, both courts properly have rejected Beretta's first line of defense: that § 510 does not in this provision prohibit retaliation as a form of "discrimination." See Appellee's Br. 29-36.

22

II

Neither the literal text nor the legislative history of ERISA defines what it means to "discriminate against" a plan participant or beneficiary for purposes of the anti-retaliation provision of § 510. Specifically, neither speaks to whether, as the district court held, only disparate treatment can qualify. The legislative history of § 510 does indicate, however, that it was patterned on the anti-retaliation provision, § 8(a)(3), of the National Labor Relations Act (NLRA) in vital respects. See 119 Cong. Rec. 30374, reprinted in Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, Legislative History of the Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406 (Comm. Print 1976), at 1774-75 (remarks of Senator Hartke) ("[Section 510's] language parallels section 8(a)(3) of the National Labor Relations Act."). For this reason, the courts properly have looked to the § 8(a)(3) precedents in interpreting various aspects of the parallel anti-retaliation provision of § 510. See, e.g., West v. Butler, 621 F.2d 240, 245 & nn. 4-5 (6th Cir. 1980); Newton v. Van Otterloo, 756 F. Supp. 1121, 1135-37 (N.D. Ind. 1991). Guidance on the question of what it means to "discriminate against" under § 510 may be found in this way.

Section 8(a)(3) of the NLRA makes it an unfair labor practice for an employer to encourage or discourage membership in any labor organization "by discrimination in regard to hire or tenure of employment or any term or condition of employment." 29 U.S.C. § 158(a)(3) (emphasis added). It is well-established that the concept of "discrimination" under this section is not limited to disparate treatment of similarly situated employees, but includes any adverse action taken against one or more employees because of their decision to engage in protected activities. F. Bartosic & R. Hartley, Labor Relations Law in the Private Sector 114 (2d ed. 1986); see Midstate Telephone Corp. v. N.L.R.B., 706 F.2d 401, 406 (2d Cir. 1983) (any action taken against an employee that "attache[s] a penalty to [protected] activity" is "discriminatory" within the meaning of§ 8(a)(3)); N.L.R.B. v. Borden, Inc., 600 F.2d 313, 320 (1st Cir. 1979); N.L.R.B. v. Jemco, Inc., 465 F.2d 1148, 1152 (6th Cir. 1972), cert. denied, 409 U.S. 1109 (1973). Retaliatory "discrimination" lies not in the fact that the employer is treating the employee less favorably than other similarly situated employees, but in the fact that it is treating him less favorably

23

than it would have treated <u>him</u> had he not engaged in the protected activity. <u>See Jemco</u>, 465 F.2d at 1152 ("[The] discrimination . . . lies in the employment benefit [being] afforded to[the employee] prior to [his] engaging in a [protected] activity," but "denied to [him] after [he] engaged in such an activity."). Disparate treatment in this regard may of course be persuasive <u>evidence</u> of"discrimination" within the intended meaning of § 8(a)(3), but it is not an essential prerequisite to a finding of such discrimination. <u>See Borden</u>, 600 F.2d at 320. As the Sixth Circuit has explained, a contrary holding"would lead to the somewhat absurd result that an employer could never be found in violation of [section 8(a)(3)] so long as he was careful to treat all [similarly situated] employees alike, no matter how destructive of employee rights his conduct may be." <u>Jemco</u>, 465 F.2d at 1152.

The same interpretive reasoning applies to the anti-retaliation provision of ERISA § 510. Like NLRA § 8(a)(3), that provision is not designed to require employers to treat all persons under the base-statute's protections alike, but simply to prevent employers from using economic leverage to discourage certain activity by those persons that Congress wanted to protect. <u>See Owens v. Storehouse, Inc.</u>, 984 F.2d 394, 398 (11th Cir. 1993) ("[Section 510] does not broadly forbid all forms of discrimination" in employment benefits, only discrimination "designed to retaliate for the exercise of a right or to interfere with the attainment of an entitled right.").

This interpretation of the term "discriminate" in § 510's anti-retaliation clause is also consistent with the established interpretation of the same term in similar anti-retaliation provisions in other federal employment statutes. Both Title VII and the Age Discrimination in Employment Act contain provisions that make it unlawful for an employer to retaliate against individuals for attempting to enforce those statutes against it.**2** Like§ 510, both of these provisions forbid

_____

**2** <u>See</u> 42 U.S.C. § 2000e-3(a) (making it unlawful for employer "to <u>discriminate against</u> any of his employees . . . because he has opposed any practice made an unlawful employment practice by[Title VII] . . . or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under[Title VII]") (emphasis added); 29 U.S.C. § 623(d) (making it unlawful for employer "to <u>discriminate against</u> any of his employees . . . because such individual

24

employers to "discriminate against" individuals for engaging in certain protected activity, but do not define the phrase "discriminate against." Both are consistently interpreted, however, to forbid an employer to take <u>any kind</u> of adverse action against an individual because he has engaged in the protected activity, even in the absence of evidence that it has treated him less favorably than other similarly situated individuals. <u>See, e.g.</u>, <u>Passer v. American Chem. Soc.</u>, 935 F.2d 322, 331-32 (D.C. Cir. 1991) (employer's cancellation of special symposium in employee's honor could constitute actionable "discrimination" under ADEA's anti-retaliation clause, where done with specific intent to retaliate against him for asserting age discrimination claim against it); <u>Ross v. Communications Satellite Corp.</u>, 759 F.2d 355, 365 (4th Cir. 1985) (any "adverse employment action"). Because the anti-retaliation provision at issue here uses the same "discriminate against" language as those other provisions, and was enacted after them, we may presume that Congress intended it to have the same basic meaning. <u>See Kimbro v. Atlantic Richfield Co.</u>, 889 F.2d 869, 881 (9th Cir. 1989) (looking to case law under Title VII's anti-retaliation provision for guidance in interpreting § 510's anti-retaliation provision), <u>cert. denied</u>, 498 U.S. 814 (1990). <u>See generally Cannon v. University of Chicago</u>, 441 U.S. 677, 696-99 (1979).

I would therefore hold, at odds with the district court, that the mere fact that Beretta's termination of health insurance premium payments did not involve disparate treatment in relation to comparably situated other plan beneficiaries did not defeat Stiltner's anti-retaliation claim as a matter of law.

III

As earlier indicated, in affirming the district court's dismissal by summary judgment of Stiltner's § 510 retaliation claim, the en banc majority does not rely, as did the district court, on the notion that an employer cannot "discriminate against" an ERISA plan participant or

_____

. . . has opposed any practice made unlawful by[the ADEA] . . . or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under [the ADEA]") (emphasis added).

25

beneficiary for retaliatory purposes except by disparate treatment in relation to comparably-situated others. The court instead affirms on the basis that an employer does not "discriminate against" a plan participant or beneficiary by revoking "gratuitously" extended benefits even if for retaliatory purposes. See ante at 13, 14 (issue stated as "whether, under ERISA § 510, an employer can `discriminate against an employee [sic] by revoking a gratuitous benefit'"); 17 (holding stated as being "that ERISA § 510 does not prohibit the revocation of gratuitously provided benefits").

Such a narrow interpretation of the intended meaning of the phrase "discriminate against" in application of § 510's anti-retaliation provision is simply wrong. It is not dictated by the statutory text nor by § 510's legislative history and it is wholly at odds with the clear purpose of this and related anti-retaliation provisions.

As the en banc majority concedes, the statutory text is ambiguous on the question whether an employer can "discriminate against" a plan participant or beneficiary in violation of § 510's anti-retaliation provision by revoking "gratuitously"-provided benefits. Ante at 13, 14. And, as the court also concedes, § 510's legislative history gives no express guidance on the question. Ante at 14. Nor is there any direct circuit interpretive precedent available. We therefore have only the bare text, "discriminate against a participant or beneficiary for exercising any right to which he is entitled under[ERISA or an ERISA plan]" and the general purposes of this and comparable anti-retaliation provisions as that may be revealed in legislative history and judicial interpretations of such comparable provisions.

Though the statutory text is ambiguous on the specific question, two aspects of the full text are critical in assessing the general purpose of § 510's anti-retaliation provision. The first is that the class protected from retaliatory action is that of plan "participants and beneficiaries," a class that is not limited to current employees. The second is that the term "discriminate against" is facially open-ended. As developed in Part II of this opinion, it is not limited to conduct involving disparate treatment. Nor is it otherwise expressly or implicitly qualified or limited by its context. Hence, as written, it appears to signify any form of significant adverse action against a protected person taken for retaliatory purposes.

26

That this is the intended broad meaning is borne out by the legislative history which indicates that the purpose of§ 510's anti-retaliation provision was to prevent employers who maintain ERISA plans from using economic leverage to intimidate participants and beneficiaries under those plans from exercising their ERISA given rights to enforce the plans' terms. See S. Rep. No. 93-127, 93d Cong., 2d Sess. (1973), reprinted in 1974 U.S. Code Cong. & Admin. News 4838, 4872 (Section 510 was enacted "in the face of evidence that in some plans a worker's pension rights or the expectations of those rights were interfered with by the use of economic sanctions). If what is being prohibited is the use by ERISA-plan employers of any form of economic leverage calculated to chill or prevent exercise of ERISA-given rights, it must be a matter of no consequence that the subject of the leverage might be a benefit that has been "gratuitously" provided. What is prohibited is coercion by economic leverage, and this may as well be effected by conditioning the continuance of a "gratuity" on foregoing the exercise of a protected right as by terminating a presumably otherwise enforceable benefit. Indeed, given the added risk of doing the latter, coercion by the conditioned-carrot method might be the more tempting device, hence one as surely contemplated by the statute.

This interpretation--that prohibited retaliatory discrimination under § 510 may be effected by terminating"gratuitous" benefits-- finds support in decisions so interpreting the ADEA's comparable anti-retaliation provision, 29 U.S.C. § 623(d). See Passer v. American Chemical Society, 935 F.2d 322, 330-31 (D.C. Cir. 1991) (employer's cancellation of special symposium honoring claimant in retaliation for exercising protected right under ADEA actionable under anti-retaliation provision, notwithstanding a "mere gratuity"); Cohen v. S.U.P.A., Inc., 814 F.Supp. 251, 259-61 (N.D.N.Y. 1993) (employer's retaliatory termination of health benefits being gratuitously provided to laid-off employee actionable under ADEA's anti-retaliation provision).

IV

Presumably because of the considerations just discussed, no court, so far as I am aware, has until now held that an employer's retaliatory cutting off of "gratuitously"-provided benefits cannot ever be found a violation of § 510's anti-retaliation provision.

27

The en banc majority purports to find such decisions in two sources, but both are flatly inapposite.

First, the court relies on two decisions, <u>NLRB v. Electro Vector</u>, 539 F.2d 35 (9th Cir. 1976), and <u>NLRB v. Wonder State Mfg. Co.</u>, 344 F.2d 210 (8th Cir. 1965), which, construing § 8(a)(3) of the NLRB, have held that an employer's retaliatory withholding of "gifts" does not violate that particular anti-retaliation provision. While, as indicated, it is quite proper to rely on decisions interpreting provisions of § 8(a)(3) that are comparable to those in § 510, <u>ante</u> at 15, these decisions do not do that. Section 8(a)(3) expressly limits the retaliatory employer conduct that it prohibits to "discrimination in regard to <u>hire or tenure of employment or any term or condition of employment</u>." 29 U.S.C. § 158(a)(3) (emphasis supplied). These decisions are simply, and properly, pointing out that "gifts" (unless they have been regularized to the status of entitlements) are not "conditions of employment," hence not prohibited means of retaliation under § 8(a)(3). But, § 510 contains no such express or implicit limitation or qualification on the kinds of retaliatory discrimination that it prohibits. Nor is its protection limited, as necessarily is that of § 8(a)(3), to employees. These § 8(a)(3) decisions therefore do not speak at all to the issue whether § 510 prohibits the retaliatory revocation of "gifts" or "gratuities" to ERISA-plan participants and beneficiaries.

The other decisions relied upon by the en banc majority, <u>Haberern</u>, 24 F.3d 1491, <u>McGath</u>, 7 F.3d 665, and <u>Woolsey</u>, 934 F.2d 1452, are equally inapposite--for the same general reason. Each, interpreting the discriminate-by-interference-with-attainment- of-benefits prong of § 510, holds that discrimination for <u>that</u> prohibited purpose can only be effected by conduct that affects "the employment relationship." None, as indicated, is interpreting the anti-retaliation prong of § 510 whose meaning is here in issue. The attainment-of-benefits prong that they are applying is, by definition, limited to employer conduct that affects <u>employee</u> participants and beneficiaries of ERISA plans by preventing their "attainment" of ERISA benefits. As to that particular prohibition, these decisions are simply making one of two points: that the specific evil at which it was aimed was purposeful manipulation of the employment relationship itself as a way of preventing employees from attaining ERISA benefits, <u>e.g. Haberern</u>, 24 F.3d at 1503 ("protects plan participants from termination motivated by an employ-

28

er's desire to prevent a pension from vesting"), or that it could not be interpreted to apply to plan amendments alone because of an employer's right as settlor to change its terms, e.g. Woolsey, 934 F.2d at 1461 (plan alternation alone not actionable even if done by disparate treatment).

Neither of these necessary limitations on conduct that can be considered discrimination under the attainment-of-benefits prong of § 510 has any application to the intended reach of the anti-retaliation provision. The anti-retaliation provision is not concerned only with employees, nor at all with the attainment of benefits; nor can its application in any way interfere, if not limited, with employers' unilateral rights to amend their plans. In consequence, these interfere-with-attainment decisions have nothing to say about whether an employer can discriminate against a plan participant or beneficiary by cutting off "gratuitous" benefits for the exercise of ERISA-given rights.

V

The only other basis for the en banc court's reading of a "gratuitous-benefit" limitation into § 510's anti-retaliation provision is what it considers the adverse public policy consequences of failing to do so. The court asserts that unless "gratuitous" benefits are excepted, benign employers (presumably in significant numbers) will be chilled from private acts of charity, while equally numerous ungrateful plan participants will be able to convert mere charitable gratuities into legal entitlements. Ante at 16. Those consequences, says the court, must surely not have been intended by Congress, so that an intention to avoid them must be read into the statute to give effect to that unexpressed legislative intent.**3**

_____

**3** The court actually goes beyond this and asserts that ERISA somehow reflects an affirmative "public policy of encouraging employers to offer employees gratuitous benefits," a policy which, it says, is supported by its decision but would be thwarted by allowing the termination of such benefits to be the subject of § 510 anti-retaliation claims. Ante at 17. There is no support in either ERISA's text or in its legislative history for the proposition that it embodies or reflects any such affirmative public policy. The court cites passages from three opinions of sister circuits as supporting its assertion, id., but none even remotely does so. The state-

29

Laying aside any skepticism one might have about how much of private-charity impulses are actually at any risk in this area, there are firm reasons for rejecting the court's public policy concerns and the related implications of Congressional intent. The first, and most obvious, is that if these twin risks--of widespread frustrations of employer altruism and unjust rewarding of undeserving ERISA-plan participants--had seemed as significant to Congress as the court assumes them to be they easily could have been avoided by simple statutory drafting that did not occur. My hunch is that Congress never thought of any such policy concerns or that, if it did, it thought them too negligible to the overall operation of ERISA to warrant any attention. Certainly it never mentioned them. The plain fact is that ERISA, on its face, and so far as its legislative history reveals, is simply indifferent to the question whether employers should go beyond the law and engage in private acts of charity to ERISA-plan participants.

Furthermore, to ascribe such weight as the court does to these concerns of possible injustices in individual cases completely misreads the fundamental purpose of this and comparable anti-retaliation provisions. They are not enacted with an eye to the relative moral worth of individual employers and those who inspire them to retaliatory action. Their fundamental purpose is in terrorem : to impose a general deterrence upon the impulse of employers to retaliate for the exercise of statutory rights against their perceived interests. Sad though it be

_____

ment in Hamilton, 945 F.2d at 79 that "[e]mployers are understandably more willing to provide employee benefits when they can reserve the right to decrease or eliminate those benefits", expresses no such general policy; it was made in support of a narrow holding that employers can, by appropriate action, reserve such a right. The statement in Owens, 984 F.2d at 398, that "[a]bsent contractual obligation, employers may decrease or increase benefits" was made in the course of upholding the right of employers to amend a plan when that right is properly reserved; it intimated nothing about a general policy of encouraging gratuitous benefits. The statement in Leavitt, 921 F.2d at 161-62 that "ERISA is concerned with protecting contractual benefits" was made as an aside in the course of holding that a plan participant may voluntarily settle a breach-of-fiduciary claim under ERISA; neither the holding nor the statement intimate anything about a general ERISA policy favoring gratuitous benefits.

30

as a commentary on human nature, it is a fact of consequence that Congress has found the retaliatory impulse sufficiently widespread and sufficiently a threat to their intended operation that it has considered anti-retaliation provisions necessary to secure the integrity of all the major employment-relations statutory schemes of recent history-- the NLRA, Title VII, the ADEA, and ERISA.

To read a gratuitous-benefit limitation into this anti-retaliation provision is flatly at odds with that general deterrent purpose. For that further reason, it is not warranted as a judicial gloss on the statute.

VI

One final point deserves mention. It concerns the precedential effect of the court's statutory interpretation. That interpretation effectively defines the "gratuitous benefit" whose retaliatory revocation is shielded from liability as broadly including any the employer "had no duty" to provide. Ante at 19.[4]

Under that interpretation, it would be of no consequence that a particular provision of benefits, though not legally obligatory, was, however, motivated wholly or to a substantial degree by provable economic self-interest rather than pure altruism. A purpose, for example, to retain the services of an employee with skills not replaceable at acceptable relative expense in the market; or a legally counselled effort to avoid possible liability because there might be a contractual obligation later determined not to exist; or a desire, because of troubled employment relations, simply to make a gesture that might return greater economic benefits than those conferred; and so on.

Though it would still, in my view, have been an unwarranted exercise in statutory interpretation, the court would at least have been nearer its professed aim of encouraging (or not discouraging) private charity on the part of employers if it had required a purer variety than simply "not compelled by duty." Tax law, in a not unrelated setting,

_____

[4] That this is the specific meaning of "gratuitous" in the court's interpretation is evident not only from the cited reference, but from its holding that, as a matter of law, the benefits provided Stiltner were "gratuitous" because not contractually or otherwise legally compelled.

31

might have provided a model in its definition of that which constitutes a "gift" for tax purposes. Concerned precisely with the difficulty of discerning raw economic self-interest behind ostensible "gifts" of one sort or another, tax law hit upon "detached and disinterested generosity" as the distinguishing mark of the true "gift." See Commissioner of Internal Revenue v. LoBue, 351 U.S. 243, 246 (1956). Who knows how Stiltner's claim, for example, might have fared under such a definition? Because it clearly fails as a matter of law under the court's doubly-unwise interpretation, we will never know. We do know, however, that in this circuit from now on employers may with impunity retaliate against ERISA-plan participants who exercise statutory rights against their perceived interests by cutting off any benefits being provided them, for whatever reason, just so long as they are not legally enforceable obligations.

VII

Because it is undisputed that Beretta ceased paying Stiltner's insurance premiums in specifically promised retaliation for his exercise of an ERISA-given right to press a claim against Beretta, this constituted discrimination in violation of § 510's anti-retaliation provision as a matter of law. The fact that this did not involve disparate treatment in relation to others, and the fact that Beretta was not legally obligated to pay the premiums are irrelevant to application of § 510's anti-retaliation provision. Accordingly, I would vacate the district court's dismissal of Stiltner's § 510 retaliation claim and remand for award of an appropriate remedy.

I am authorized to state that Chief Judge Ervin, Judge Hall, Judge Murnaghan and Judge Michael join in this concurring and dissenting opinion.

32