STONEWALL JACKSON MEMORIAL HOSPITAL, a non-profit West Virginia Corporation, Plaintiff,

v.

AMERICAN UNITED LIFE INSURANCE COMPANY, a Qualified Foreign Corporation, Gardner & White Corporation, a non-qualified foreign corporation, Gardner & White, Inc., a non-qualified foreign corporation, Gardner & White Consulting Services, Inc., a non-qualified foreign corporation and Harry D. Jackson, an individual, Defendant.

Civil Action No. 1:96–CV–160.

United States District Court, N.D. West Virginia.

April 30, 1997.

---

Robert G. Steele, Steptoe & Johnson, Clarksburg, WV, for Plaintiff.

David K. Schwirian, Pauley, Curry, Sturgeon & Vanderford, Charleston, WV, Phillip R. Scaletta, Ice Miller Donadio & Ryan, Indianapolis, IN, for Defendant American United Life Ins. Co.

Stephen R. Brooks, Furbee, Amos, Webb & Critchfield, Fairmont, WV, for Defendants Gardner & White Corp., Gardner & White, Inc., Gardner & White Consulting Services, Inc. and Harry D. Jackson.

## MEMORANDUM OPINION AND ORDER

KEELEY, District Judge.

This matter is before the Court on the motion of the plaintiff, Stonewall Jackson Memorial Hospital, to remand the case to the Circuit Court of Lewis County, West Virginia. The legal issues underlying this motion have been fully briefed in accordance with Local Rule of Civil Procedure 4.01 and the Court, therefore, finds them ripe for review. For the reasons that follow, the motion of the plaintiff is GRANTED and the case is REMANDED to the Circuit Court of Lewis County, West Virginia.

## I. FACTUAL BACKGROUND [1]

Sometime in the mid–1970s, plaintiff Stonewall Jackson Memorial Hospital ("Stonewall") adopted a purchase money pension plan ("the Plan") for the benefit of its employees. The Plan's purpose was to provide eventual retirement benefits to hospital employees, through funds generated by cash contributions made by Stonewall at regular intervals and the resulting investment income earned on these contributions. Under the terms of the Plan, each qualified participant is assigned a pro rata portion of the employer's lump sum annual contribution. To this portion, an amount representing the annual investment earnings or loss on the lump sum is either added or subtracted. This amount is calculated by applying an annual interest rate, which represents the annual rate of return earned on the Plan assets in aggregate, to the principal amount contained in the Plan accounts of the individual participants. It is undisputed that this pension Plan is covered by the provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").

1. The facts that follow are those recited in the plaintiffs' complaint.

The plaintiff alleges that the Plan it adopted was based on proposals submitted to both Stonewall and the West Virginia Hospital Association ("Association") by defendant insurance agent Harry D. Jackson ("Jackson")[2] on behalf of defendants Gardner & White Corporation, Gardner & White, Inc., and Gardner & White Consulting Services, Inc. (collectively "Gardner & White") and American United Life Insurance Company ("AUL").

The Plan's governing document, which Stonewall alleges was drafted by Gardner & White and AUL, originally provided for the investment of all Plan assets through an annuity contract issued by AUL, that had previously been executed between AUL and the West Virginia Hospital Association ("annuity contract"). The terms of the Plan, however, do not limit Stonewall's authority to decide how and where to invest the Plan's assets on behalf of participants and beneficiaries. The AUL annuity contract therefore was only one of a myriad of investment possibilities under the Plan, the only requirement being that the investment medium chosen be a prudent one. Despite these other options, however, Stonewall elected to become a party to the AUL annuity contract which, thus, became the Plan's chosen investment medium.

To effect this investment scheme, at roughly the same time the Plan was adopted, Stonewall and AUL executed a joinder agreement under which all Plan assets were invested through the annuity contract and were, therefore, held by AUL.

Stonewall alleges that the contract it adopted set out only two procedures by which its terms could be amended. The first of these allowed AUL to unilaterally amend the contract, but only after giving the Association thirty days notice, and only to the extent that the changes did not affect contributions made prior to the amendment's effective date. The second procedure provided for amendment through written agreement between the Association and AUL, and further required the consent of the employee participants of the pension plan regarding amendments whose adoption would adversely affect benefits provided by pre-amendment contributions.

In April of 1995, Stonewall, for reasons unknown to the Court, decided to change investment media. This decision prompted Stonewall to request that AUL transfer the existing Plan assets into the alternative medium. Although AUL apparently completed such a transfer, Stonewall alleges that it refused to do so until Stonewall had executed a written waiver of all potential legal claims relating to the transfer. The Hospital further alleges that AUL improperly reduced the total amount transferred by 4.6%, claiming entitlement to certain surrender charges and liquidation fees. Both of these actions were apparently taken in conformance with the terms of the annuity contract, which had, by this time, been amended at least twice by agreement between AUL and the Association. Stonewall asserts that it never consented to these amendments and that the defendants led it to believe that they would apply only to the Association.

On September 4, 1996, Stonewall filed suit against AUL, Gardner & White and Jackson in the Circuit Court of Lewis County, West Virginia. The complaint alleges that AUL applied the 4.6% reduction and written waiver requirement to the transfer of the Plan's assets pursuant to amendments to the annuity contract which were effected by AUL and the Association in October 1993. Stonewall further asserts that the effective application of these amendments to its Plan's assets is in derogation of the contract's original terms. Specifically, Stonewall alleges that since it never consented to the amendments in question, they constitute unilateral amendments to the contract and that AUL was therefore required to provide it with thirty (30) days notice before effecting the amendments, and to limit their application to contributions and investment returns which accrued after the amendments' effective dates. Stonewall asserts that none of these contractual obligations was honored. The complaint also alleges that, at the time the amendments were executed, all defendants misrepresen-

---

**2.** Jackson is a resident of the State of West Virginia, as is the plaintiff. Accordingly, "diver-sity of citizenship" as described in 28 U.S.C. § 1332, does not exist in this case.

ted the nature, scope and practical effect of the amendments to Stonewall.

The complaint includes four separate counts, each nominally grounded in state law. Count I alleges that the actions of AUL in imposing the liquidation and surrender fees and "compelling" Stonewall to execute a written waiver of potential claims constitutes a breach of the terms of the annuity contract. Count II charges all of the defendants with breach of the annuity contract as well as violation of the duty of good faith and fair dealing in connection with this breach and the attendant representations. Count III charges all the defendants with professional negligence in connection with expert advice offered to Stonewall concerning the Plan. Finally, Count IV alleges that all defendants engaged in unfair and deceptive trade practices in connection with the amendment of the annuity contract, the reduction of the monies transferred, and the attempted resolution of the dispute that subsequently arose.

On October 10, 1996, a document styled "Notice of Filing of Defendants' Joint Notice of Removal" was filed with the Court. Addressed to the plaintiffs' counsel, the document reflects that the case had been removed to the United States District Court for the Northern District of West Virginia on October 9, 1996. The Notice is signed by Stephen R. Brooks, Esquire, as counsel for defendants Gardner & White and Jackson, and by Heather LaFollette, an attorney associated with Brooks' firm, for David Schwirian, Esquire, counsel for AUL.[3]

As to the jurisdictional basis for removal, the Notice asserts that this Court has federal question jurisdiction over the case because the state-based causes of action asserted by the plaintiff all "relate to" the administration of a pension benefit plan which is governed by ERISA and, as such, are preempted by its § 514(a).

On November 8, 1996, Stonewall filed a Motion to Remand the case to the Circuit Court of Lewis County. In its memorandum in support of its motion, it first contends that the joint notice of removal violates the so-called "rule of unanimity" because it lacks independent verification of AUL's consent to the removal. Secondly, Stonewall asserts that its claims are not preempted by § 514(a) of ERISA and that the Court, therefore, lacks original jurisdiction over its claims, thereby making their removal improper.

On November 11, 1996 (33 days after the case was purportedly removed), after reviewing Stonewall's remand motion, Attorney David Schwirian signed the Joint Notice of Removal, directly above Ms. LaFollette's signature, and resubmitted the same to the Clerk of Court for filing. Then, on November 21, 1996, Schwirian executed an affidavit attesting to his participation in the drafting of the joint notice, his authorization of Ms. LaFollette to sign the notice on his behalf, his client's consent to the removal, and his subsequent attempt to personally sign the notice. This affidavit was attached as Exhibit B to the defendants' memoranda opposing plaintiff's motion to remand which was submitted to the Court on November 22, 1996.

## II. ANALYSIS

The plaintiff has offered two arguments in support of its motion to remand. The first alleges a defect in the procedure by which the case was removed; the latter questions the Court's jurisdiction over this matter. The Court will consider these arguments separately.

### A. The Rule of Unanimity.

The procedure for removal of a case from state to federal court is governed by 28 U.S.C. § 1446, which provides, in relevant part:

> (a) A defendant or defendants desiring to remove any civil action or criminal prosecution from a state court shall file in the district court of the United

---

**3.** Although he states that he granted express permission for and even participated (via facsimile), in the drafting of the Notice, Schwirian says he was unable to actually sign the notice because his office is located in Charleston, West Virginia, approximately 140 miles south of Fairmont, West Virginia, where Mr. Brooks' firm is situated. Schwirian asserts that when all parties involved were satisfied with the composition of the notice he gave his express permission for Ms. LaFollette to sign it on his behalf, thereby affirming his client's consent to the removal.

States for the district and division within which such action is pending a notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action.

(b) The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based ...

28 U.S.C. § 1446.

■ Although not expressly stated within the statute, it is well established that, in cases involving multiple defendants, each must join in the petition for removal. *See Chicago, R.I. & P.R. Co. v. Martin*, 178 U.S. 245, 20 S.Ct. 854, 44 L.Ed. 1055 (1900). Over the years, this uncodified axiom has come to be known as the "rule of unanimity." *See Martin Oil v. Philadelphia Life Ins.*, 827 F.Supp. 1236, 1237 (N.D.W.Va.1993).

■ Although this rule does not require each defendant (or its counsel) to sign the joint notice of removal individually, it does require each to register to the Court its official and unambiguous consent to a removal petition filed by a co-defendant within the thirty day window afforded by 28 U.S.C. § 1446(b). *Id.* (citing *Mason v. IBM*, 543 F.Supp. 444, 446 (M.D.N.C.1982)). Stonewall contends that the signing of the joint petition by associate counsel for Gardner & White and Jackson on behalf of AUL's counsel violates the "rule of unanimity" because it does not sufficiently register AUL's consent to the removal.

In *Martin Oil*, then Chief Judge Maxwell was faced with a situation almost identical to that presently before the Court. A multi-defendant case was removed to this Court on the primary basis of federal question jurisdiction and signed only by counsel for one of two defendants. The removal notice, however, stated that the non-signing defendant "concurs with and joins in the decision of [the signing defendant] to remove this action from state to federal court." *Martin Oil*, 827 F.Supp. at 1236. Counsel for the non-signing defendant filed no separate notice of removal or other written pleading evincing independently his client's consent to the removal.

In assessing the propriety of the removal, Judge Maxwell stated:

It has been recognized that 28 U.S.C. 1446 'requires all defendants, individually, or through their counsel, to voice their consent before the court, *not through another attorney*.' *Creekmore v. Food Lion. Inc.*, 797 F.Supp. 505, 509 (E.D.Va.1992).

*Martin Oil*, 827 F.Supp. at 1238.

■ He then went on to hold that

it is insufficient for a defendant who has not signed the removal petition to merely advise the removing defendant that it consents to removal and that the removing defendant may represent such consent to the Court on its behalf. Rather, the non-signing defendant must voice such consent directly to the Court by filing a separate pleading which expresses consent to join in.

*Id.* at 1239.

■ The holding in *Martin Oil* is absolutely apposite to the facts here. While the joint notice of removal represents that AUL joins in the decision to remove the case, counsel for AUL did not directly voice this consent to the Court within thirty days of AUL's receipt of the complaint, either by placing his signature on the notice or by filing a separate pleading.

Despite the defendants' arguments to the contrary, the Court views Ms. LaFollette's signature on behalf of Mr. Schwirian as tantamount to a representation by a signing defendant that a non-signing codefendant has advised of its consent to the removal. As an officer of this Court, Ms. LaFollette's representations certainly are entitled to the Court's highest confidence. This does not, however, alter the fact that her signature on behalf of Mr. Schwirian is deficient under *Martin Oil*'s holding.

Similarly unavailing is the defendants' argument that "substantial compliance" with removal procedures is sufficient where removal is predicated upon the Court's federal question jurisdiction. This argument must fail in view of the fact that in *Martin Oil*, the removal also was primarily sought pursuant to the Court's federal question jurisdiction.

Finally, as the latter part of the *Martin Oil* opinion makes clear, Schwirian's subsequently filed notice and affidavit cannot cure the procedural defect where both were filed well beyond the thirty day statutory window for removal. By rejecting the non-signing defendant's argument that it had cured any defect by filing supplemental affidavits outside § 1446(b)'s thirty-day window, *Martin Oil* served clear notice that the requisite consent must be voiced within thirty days of the defendant's receipt of the complaint. *Id.* at 1239.

While defense counsel may disagree with the reasoning underlying the *Martin Oil* opinion, it has been applied by this Court in prior cases and controls the outcome here. *See Sanner v. West Virginia Infusion Therapies, Inc.,* No. 1: 95–CV–79 (N.D.W.Va., Oct. 11, 1995) (attached to plaintiff's motion to remand as Exhibit A). Accordingly, the important interests in *stare decisis,* consistency and general fairness dictate that the Court apply it in the present case as well, at least in the absence of compelling equities favoring exception. The Court has discovered no such equities in the facts of this case, especially since the defendant AUL has been unable to articulate an extenuating circumstance underlying its failure to register directly its consent to the removal. As for general fairness, the Court concurs with the sentiments of Judge Maxwell:

> [T]here is nothing unfair about requiring each defendant to either sign the notice of removal, file its own notice of removal, or file a written consent or written joinder to the original notice of removal.

*Martin Oil,* 827 F.Supp. at 1238.

Accordingly, the removal of this case was procedurally defective and remand is appropriate.

## B. *Federal Question Jurisdiction.*

Even if the defendants had followed the proper removal procedure, however, remand would still be appropriate here because the Court lacks original jurisdiction over this case.

▅▅ Removability of actions is governed generally by 28 U.S.C. § 1441(a) which states, in relevant part:

> Except as otherwise provided by Act of Congress, any civil action brought in a state court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants …

28 U.S.C. § 1441(a). Defendants argue that the Court has original jurisdiction over this action through 28 U.S.C. § 1331 which provides:

> The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

28 U.S.C. § 1331. This type of original jurisdiction is commonly known as "federal question jurisdiction," and its existence is generally assessed in light of a doctrine which has come to be known as the "well-pleaded complaint rule." *See Franchise Tax Bd. v. Laborers Vacation Trust,* 463 U.S. 1, 9, 103 S.Ct. 2841, 2846, 77 L.Ed.2d 420 (1983). Under this doctrine, causes of action are deemed to "arise under the Constitution, laws, or treaties of the United States" when the allegations contained within the four corners of the plaintiff's "well-pleaded complaint" raise questions of federal law. *Gully v. First National Bank,* 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936); *Louisville & Nashville R. Co. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). Moreover, to confer federal question jurisdiction these issues of federal law must ordinarily

> be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, *unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose.*

*Franchise Tax Bd.,* 463 U.S. at 10, 103 S.Ct. at 2846 (quoting *Taylor v. Anderson,* 234

U.S. 74, 75–76, 34 S.Ct. 724, 724, 58 L.Ed. 1218 (1914) (emphasis added).

In the present case, each of the four counts comprising the plaintiff's complaint is nominally grounded in state law. Moreover, the defendants' assertion that these claims are preempted by § 514(a) of ERISA is merely a defense to such claims and therefore insufficient, in and of itself, to establish federal question jurisdiction under the auspices of the "well-pleaded complaint rule." *See Franchise Tax Bd.*, 463 U.S. at 25–27, 103 S.Ct. at 2854–55.

■ There is, however, an established exception to the rule which derives from the notion that Congress may so completely preempt a certain area of law that any claim which effectively implicates this area is necessarily federal in character, regardless of the nominal legal theory under which the plaintiff elects to pursue prosecution. *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63–64, 107 S.Ct. 1542, 1546–47, 95 L.Ed.2d 55 (1987). This exception, in turn, is generally known as the "complete preemption doctrine," and it was first recognized in the context of contractual disputes between employers and labor unions. In *Avco Corp. v. Machinists*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968), the Supreme Court held that the preemptive force of § 301 of the Labor Management Relations Act was so powerful as to displace entirely all causes of action alleging the breach of a collective bargaining agreement. *Franchise Tax Bd.*, 463 U.S. at 23, 103 S.Ct. at 2853–54. Thus, within certain narrowly demarcated enclaves of the law, traditional common law causes of action must give way completely to exclusive statutory remedies created by Congress.

■ In *Metropolitan Life, supra,* the Court extended complete preemptive status to all causes of action brought by participants or beneficiaries of ERISA-regulated plans to recover benefits allegedly due them under the terms of these plans. After careful scrutiny of ERISA's language and legislative history, the Court concluded that Congress had clearly intended ERISA's § 502(a)(1)(B) to

provide the exclusive vehicle for resolution of such disputes. *Id.* at 64–67, 107 S.Ct. at 1546–48. Like their labor-law counterparts, therefore, suits to recover benefits allegedly denied in contravention of the terms of an ERISA plan always "arise" under ERISA's § 502(a)(1)(B) and are always removable irrespective of the law in which the plaintiff chooses to frame them.

The claims presently before the Court do not involve the attempted recovery of benefits by plan participants or beneficiaries under the terms of an ERISA plan and, therefore, do not fall directly within the ambit of *Metropolitan Life,* whose holding was expressly confined to benefit recovery claims. *See Metropolitan Life,* 481 U.S. at 67, 107 S.Ct. at 1548 (Brennan J. concurring). Nonetheless, defendants argue strenuously that Stonewall's claims are "completely preempted" by ERISA and that federal question jurisdiction therefore exists.

In order to determine whether this argument has any merit, the Court must apply the two-part analysis for "complete preemption" articulated by the Fourth Circuit in *Custer v. Sweeney*, 89 F.3d 1156 (4th Cir. 1996). Under this rubric, a court must first determine whether the substance of the claims falls within the *scope* of the federal statute; and secondly, whether the statute's preemptive *force* is such that complete preemption is mandated. *Id.* at 1165. The first inquiry entails subjecting the plaintiff's claims to the classic ERISA preemption analysis under § 514(a), while the second demands a more individualized assessment of the degree to which ERISA precludes state court consideration of the particular claims.

> Only where the federal statutes' preemptive scope is sufficiently broad to reach a purported state law claim and its preemptive force is sufficiently powerful to convert that particular claim into a federal claim will the complete preemption doctrine apply.[4]

*Id.*

■ Section 514(a) of ERISA provides in relevant part:

> that a finding that Stonewall's claims are preempted by ERISA is tantamount to finding

---

4. In their opposition memorandum, defendants Gardner & White and Jackson appear to argue

[T]he provisions of this subchapter ... shall supersede any and all state laws insofar as they may now or hereafter *relate to* any employment benefit plan described in section 1003(a) of this title ...

29 U.S.C.A. § 1144(a) (1985) (emphasis added). Because there is no question that the pension plan at the heart of this case falls within the purview of 29 U.S.C. § 1003(a), and, therefore, ERISA, the principal question confronting the Court is whether Stonewall's claims "relate to" the plan within the meaning of § 514(a).

A law 'relates to' a covered employee benefit plan for the purposes of § 514(a) if it [1] has a connection with or [2] reference to such plan.

*California Division of Labor Standards Enforcement v. Dillingham Construction,* —— U.S. ——, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–98, 103 S.Ct. 2890, 2899–2900, 77 L.Ed.2d 490 (1983)). Defendants assert that Stonewall's claims cannot be resolved by the Court *without reference* to the ERISA regulated plan, and that the claims

that these claims are "completely preempted" as were those in *Metropolitan Life.* Such reasoning misapprehends the doctrine of complete preemption.

The assertion of ERISA preemption under § 514(a) is merely a defense to the purportedly state-law based claims and, as such, may be properly asserted in either federal or state court. By contrast, the assertion of "complete preemption" requires a showing not only that the state-based claims are preempted or within the scope of § 514(a), but also that Congress intended a particular enforcement provision within ERISA to be the exclusive avenue by which the substance of the claims may be addressed. This latter requirement is the essence of *Custer's* "preemptive force" inquiry.

While a threshold finding that Stonewall's claims are within the scope of and, therefore, preempted by § 514(a) would provide defendants with a valid defense to these claims, it does not, by itself, allow defendants to circumvent the dictates of the "well-pleaded complaint rule" and thereby remove this case to federal court.

5. The defendants do not appear to be basing their ERISA preemption argument on the "connection" prong of the "relates to" definition enunciated in *Shaw.* Nor would such an argument likely be effective in light of recent Supreme Court precedent which further elucidates the nature of the "forbidden connection."

therefore "relate to" the plan.[5] The Supreme Court has generally found the "forbidden reference"

[w]here a state's law acts immediately and exclusively upon ERISA plans ... or where the existence of ERISA plans is essential to the law's operation, ...

*California Division of Labor,* —— U.S. at ——, 117 S.Ct. at 838.

In making their "reference" argument, defendants rely principally upon the case of *Stiltner v. Beretta U.S.A.,* 74 F.3d 1473 (4th Cir.1996). *Stiltner* involved a multi-claim lawsuit filed by an employee against his employer alleging the wrongful denial of benefits under an ERISA regulated disability plan. In one particular count of the complaint, the plaintiff alleged that in refusing to pay the benefits allegedly due him under the terms of the plan, and by threatening to cut off other benefits if he did not drop his claim, the employer was liable to him under Maryland common law for intentional infliction of emotional distress. The court found that such a claim was preempted by § 514(a) because its resolution would necessitate ref-

In *New York State Conference of Blue Cross Blue Shield v. Travelers Ins. Co.,* 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995), the court listed three types of laws which can be said to have this "forbidden connection" with an ERISA plan. The first are those laws that "mandate employee benefit structure or their administration." *Id.* at 658, 115 S.Ct. at 1678. The second type of preempted law is that which purports to bind plan administrators to particular choices, or to preclude uniform administrative practice. *Id.* at 659–661, 115 S.Ct. at 1679. Finally, the connection is present in state laws that provide "alternate enforcement mechanisms" by which participants or beneficiaries may obtain benefits under the terms of the plan. *Id.* at 658, 115 S.Ct. at 1678. *See also Coyne & Delany v. Selman,* 98 F.3d 1457, 1468 (4th Cir. 1996). (*Coyne & Delany I*)

Each of these preempted causes of action makes its forbidden connection to the ERISA plan through its ability to directly interfere with the internal operations of the plan itself. The causes of action in the present case, by contrast, seek only to enforce rights arising in the context of the plan's external funding mechanism. As such these claims do not potentially implicate the structure, choice, or provision of benefits under the terms of the plan.

erence to the plan itself. *Id.* at 1481. The "forbidden reference" in *Stiltner* arose from the fact that the validity of the plaintiff's claim could not be assessed without a judicial determination as to whether the employer had complied with the obligations placed upon it by the plan. Accordingly, non-compliance with the terms of the plan became an element in the plaintiff's cause of action. In this way, the plan's existence was essential to the operation of an otherwise state law based cause of action. *Id.*

A similar situation was presented in *Ingersoll–Rand v. McClendon,* 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). The plaintiff there had filed a wrongful discharge action in Texas state court under various common law theories, alleging that a principal motivating factor in his termination had been his employer's desire to avoid making contributions on his behalf to an ERISA regulated pension fund. The trial court granted summary judgment to the employer, but the Texas Supreme Court reversed and remanded, holding that substantial public policy supported a common law cause of action for wrongful discharge where the principal reason for the discharge was the employer's desire to avoid such contributions. *Id.* at 136, 111 S.Ct. at 481.

On writ of certiorari, the United States Supreme Court reversed, holding that this new cause of action was preempted by § 514(a) of ERISA because its resolution would necessitate reference to the ERISA regulated plan. The Court stated:

> Here, the existence of a pension plan is a critical factor in establishing liability under the State's wrongful discharge law. As a result, this cause of action relates not merely to pension benefits, but to the essence of the pension *plan* itself.

*Id.* at 139–40, 111 S.Ct. at 483 (emphasis in original). Again, the "forbidden reference" was found to exist where the maintenance of the cause of action necessitated the establishment of rights and duties arising under the terms of the plan, in that instance, the duty of the employer to make contributions on behalf of its employees. *Id.*

It is equally clear, however, that not all prospective references, however attenuated their nexus to the plan, will trigger preemption under § 514(a). Indeed, in *Shaw,* the Supreme Court cautioned that

> some state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan.

*Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21.

This distinction was recently explored further by the Fourth Circuit Court of Appeals in *Coyne & Delany Co. v. Selman,* 98 F.3d 1457 (4th Cir.1996) (*Coyne & Delany I*) In this case, the court considered whether a state-law based malpractice claim brought by a plan sponsor against an insurance professional for allegedly failing to procure proper replacement insurance for an ERISA regulated plan was preempted by § 514(a). Citing its holding in *Custer,* the court reiterated its conclusion that, in enacting § 514(a), Congress did not intend to preempt "traditional state-based laws of general applicability [that do not] implicate the relations among the traditional ERISA plan entities," which include the employer, the plan fiduciaries, the plan, and the beneficiaries. *Id.* at 1469. The court went on to find that the malpractice claim did not give rise to the "forbidden reference" because the existence of the plan was not critical to the maintenance of the claim. The court reasoned that

> [c]ommon law professional malpractice, along with other terms of tort liability has historically been a state concern. Moreover, a common law professional malpractice claim is 'a generally applicable [law] that makes no reference to, or functions irrespective of, the existence of an ERISA plan.' *Ingersoll–Rand,* 498 U.S. at 139, 111 S.Ct. at 483. The state law at issue in this case imposes a duty of care on all professionals, including all insurance professionals. Common law imposes the duty of care regardless of whether the malpractice involves an ERISA plan or a run-of-the-mill automobile insurance policy. *Thus, the duty of care does not depend on ERISA in any way.*

*Id.* at 1471 (emphasis added). Thus, the "forbidden reference" was not found to exist

since the elements of the cause of action did not necessitate the establishment of rights or obligations arising under the plan's terms. In this way, the action did not implicate the plan's operational "essence."

 The facts in the present case resemble those in *Coyne and Delany I* much more than those in *Stiltner* and *Ingersoll–Rand.* Unlike the latter cases, resolution of Stonewall's claims will not produce the "forbidden reference" to the ERISA-regulated pension plan because the legal rights and obligations on which resolution of these claims will depend flow not from the Plan itself but from the terms of the collateral annuity contract, and from West Virginia law.

The core issue underlying Counts I and II of Stonewall's complaint is whether the alleged unilateral amendment ·of the annuity contract resulting in the waiver requirement, liquidation fees and surrender charges violated Stonewall's contractual rights under the original agreement to which it became a party. The core issue as to Counts III and IV is whether the defendants' conduct violated certain duties imposed by West Virginia law. Resolution of these issues will not necessitate the establishment of any rights or obligations arising under the terms of the ERISA regulated pension plan.

While the defendants baldly assert that the Plan and the annuity contract "are so intertwined as to be functionally inseparable" (see Defendants Gardner & White and Jackson's Memorandum in Opposition to the Plaintiff's Motion to Remand at p. 9), this assertion is belied by the fact that the Plan will most certainly continue to exist even though the contract has been cancelled. Although the contract was clearly executed as a direct result of the creation of the Plan, the Plan is assuredly not essential to the operation of the contract, or to the separate rights and duties that it creates, most notably those which relate to its amendment.

By contrast, in both *Stiltner* and *Ingersoll–Rand,* the preempted causes of action would have required the plaintiff to prove the existence of legal obligations arising solely under the terms of ERISA regulated plans. The plaintiff in *Stiltner* could not have met his burden of proof without establishing that

benefits were wrongfully withheld from him *under the terms of his plan.* Similarly, in *Ingersoll–Rand* in order to prevail, the plaintiff would have had to establish that once he had been terminated, *under the terms of his plan* his employer was no longer obligated to make contributions on his behalf. In this way, the existence of these plans was essential to the operation of the preempted causes of action.

In both *Coyne and Delany I* and the present case, however, the rights and duties forming the basis of the plaintiffs' claims exist irrespective of any rights and duties that arise under an ERISA plan.

The mere fact that peripheral reference to the plan's terms might be required in order to assess the total amount of damages does not alter this conclusion. In *Coyne and Delany I,* the Fourth Circuit stated:

> To be sure, resolution of Delaney's malpractice claim will require an examination of certain provisions in the Delaney Plan the defendants drafted and the Security Policy the defendants procured. Thus, to some extent the court's inquiry will be 'directed to the plan.' *See Ingersoll–Rand,* 498 U.S. at 140, 111 S.Ct. at 483. However, we do not believe this factor carries much weight in this context. In considering Delaney's claim, the court's inquiry will be centered on whether the defendants' conduct comported with the relevant professional standard of care.... Delaney's claim, although it may require the court to examine some provisions of an ERISA plan, turns on duties generated by Virginia common law.

*Coyne and Delany,* 98 F.3d at 1472. Similarly, in the present case, Stonewall's claims will turn on the duties generated by the provisions of the collateral annuity contract and West Virginia law in spite of the fact that it may be necessary for the Court to examine some of the plan's provisions in their ultimate resolution.

 Nor is this conclusion altered by the fact that Stonewall has brought this action in its capacity as an ERISA plan fiduciary and that any recovery it might receive will ultimately be distributed to plan participants

and beneficiaries. In *Mackey v. Lanier Collection Agency & Service,* 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988), the United States Supreme Court considered whether § 514(a) preempted the state of Georgia's general garnishment statute when applied to individual participants' accrued benefits under an ERISA regulated welfare plan. Citing § 502(d)(1), the Court began with the recognition that ERISA expressly provides that "an employee benefit plan may sue or be sued under this subchapter as an entity." 29 U.S.C. § 1132(d)(1). After noting that this directive relates solely to actions arising under ERISA's civil enforcement provisions, the Court went on to state:

> ERISA plans may be sued in a second type of civil action as well. These cases—lawsuits against ERISA plans for run-of-the mill state-law claims such as unpaid rent, failure to pay creditors, or even torts committed by an ERISA plan—are relatively common place. [footnote omitted] Petitioners ... concede that these suits, although obviously affecting and involving ERISA plans and their trustees, are not preempted by ERISA § 514(a).

*Id.* at 833, 108 S.Ct. at 2187.

The reasoning underlying this language seems equally applicable to situations in which a plan fiduciary brings a lawsuit relating to a run-of-the mill administrative matter for the benefit of the plan as a whole. Accordingly, the Court concludes that Stonewall's status as a plan fiduciary in this action does not, in and of itself, trigger § 514(a) preemption.

After an exacting examination of the text and structure of ERISA's preemption and enforcement provisions, the Supreme Court in *Mackey* went on to hold that the state garnishment mechanism was not preempted by § 514(a) even though its operation might prevent plan participants from receiving their benefits, and, at a minimum, would impose additional administrative costs and burdens upon the plan as a whole. *Mackey,* 486 U.S. at 831—832, 108 S.Ct. at 2186; *New York State Conference of Blue Cross & Blue Shield v. Travelers Insurance Co.,* 514 U.S. 645, ——, 115 S.Ct. 1671, 1680, 131 L.Ed.2d 695 (1995). It, therefore, logically follows that § 514(a) preemption cannot be triggered by the mere fact that an action brought by a plan fiduciary might ultimately reduce the plan's overall administrative costs, and thereby actually increase the assets available for distribution to participants and beneficiaries.

Accordingly, the claims in Stonewall's complaint are not within the preemptive scope of ERISA's § 514(a). The Court, therefore, finds it unnecessary to consider the preemptive force of ERISA in relation to the particular claims asserted by Stonewall.

### III. CONCLUSION

Inasmuch as the claims alleged in Stonewall's complaint do not fall within the preemptive scope of § 514(a) of ERISA, they cannot possibly come within the purview of the doctrine of "complete preemption" under the analysis set forth in *Custer v. Sweeney, supra.* By default, therefore, these claims must be examined in light of the "well-pleaded complaint rule" to determine the existence of federal question jurisdiction. When the claims are thus viewed, it becomes apparent that they do not "[arise] under the constitution, laws or treaties of the United States," 28 U.S.C. § 1331, since they are all grounded in state law. The Court, therefore, lacks original jurisdiction over this matter under 28 U.S.C. § 1331, and its removal was improper under 28 U.S.C. § 1441(a). Consequently, the Court will REMAND the case to the Circuit Court of Lewis County, West Virginia.

### ORDER

For the reasons stated in the accompanying memorandum of law, the motion of the plaintiff, Stonewall Jackson Memorial Hospital Company to Remand (Docket No. 13) is GRANTED and this case is hereby REMANDED to the Circuit Court of Lewis County, West Virginia. The motions of the plaintiff to stay proceeding (Docket No. 39) and for a protective order (Docket No. 41) are DENIED as moot. The motion of the defendant Gardner & White Consulting Service, Inc. to dismiss (Docket No. 5) as well as that of defendant American United Life Insurance Co. to strike the plaintiff's request

for a jury trial (Docket No. 11) are DENIED as MOOT.

The Clerk is directed to transmit copies of this Order to counsel of record.